

| | United States District Court, Northern District of Illinois | | | |
|---|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | | |
| CASE NUMBER | 99 C 6173 | DATE | 9/27/2001 | |
| CASE TITLE | Robert J. More vs. J.B. Hunt Transport | | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Hunt's motion for summary judgment (Doc. No. 84-1) is granted. Its motion to modify the court's previous scheduling orders (Doc. No. 103-1) is denied without prejudice as moot. Judgment entered in favor of Defendant and against Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 28 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 9/27/2001 date mailed notice | |
| ETV | courtroom deputy's initials | 01 SEP 27 PM 5:06 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DOCKETED SEP 28 2001

| | |
|---|---|
| ROBERT J. MORE, | ) |
| Plaintiff, | ) |
| v. | ) No. 99 C 6173 |
| J.B. HUNT TRANSPORT, | ) Judge Rebecca R. Pallmeyer |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert J. More, pro se, brings this action against his former employer, Defendant, J.B. Hunt Transport, Inc. ("Hunt"). More alleges that Hunt wrongfully terminated him on account of his religion. Hunt now moves for summary judgment on each of More's claims. For the reasons set forth below, Hunt's unopposed motion for summary judgment is granted.

## PROCEDURAL HISTORY

The procedural history of this case is discouraging. Mr. More filed this case on September 17, 1999. One week after Defendant filed its answer, Mr. More made his first request for a 150-day "continuance to respond to whatever response defendant provides to plaintiff's original complaint." (Doc. No. 6.) The court denied that request and directed the parties to meet and prepare a proposed discovery schedule. (Doc. No. 5.) Plaintiff again sought a continuance and asked the court to appoint counsel for him. (Doc. No. 8, 10.)

In February, the court granted More's motion for appointment of counsel. (Doc. No. 14.) Attorney Stanley Niew filed an appearance on More's behalf on March 1, 2000

(Doc. No. 17); by March 8, More had filed another pro se motion to postpone further proceedings. (Doc. No. 18.) When the court denied that motion (Doc. No. 21), More filed an appeal, which the Court of Appeals dismissed for want of jurisdiction a few weeks later. (Doc. No. 22, 28.) In a March 15, 2000 order, the court granted Plaintiff's renewed request for continuance, but cautioned him to be prepared to proceed at the next status conference and reminded him that because he was represented by counsel, he need not file further pro se motions. (Doc. No. 24.) By May 18, Plaintiff's appointed attorney sought leave to withdraw, a request the court granted with regret. (Doc. 29, 31.) In light of the reasons set forth for the motion, the court declined to appoint another attorney.

Mr. More gave his own deposition in the courthouse on June 8, 2000. (*See* Doc. No. 32.) The transcript of that deposition is the central piece of evidence offered in support of the motion for summary judgment filed by Defendant on October 30, 2000. (Doc. No. 87.) In dozens of court filings since giving his deposition, Mr. More has sought relief regarding discovery issues (Doc. No. 40, 45, 46, 49, 54, 58, 66, 68, 74, 77), asked the court to order him reinstated "in his former employment position on an interim basis pending final rectification of the legally prohibited injustices presumptively present" (Doc. No. 79), moved for default judgment against the Defendant (Doc. No. 101), asked the court to give him reading assignments (Doc. No. 108), asked the judge to sign an affidavit attesting that she has read his many submissions (Doc. No. 116), and sought further continuances (Doc. No. 111, 114). What he has not done is file a response to the motion for summary judgment that has been

2

pending now for eleven months. The court denied many of Mr. More's requests, but did permit him to record the deposition of his former supervisor, Mr. Eichler, by way of a tape recorder (Doc. No. 92, 98) (to the court's knowledge, Mr. More has never proceeded with this deposition). The court also required Defendant to undergo burdensome efforts to produce records concerning certain of Mr. More's coworkers. (Doc. No. 102, 105, 108.) To permit him a fair opportunity to review those records, the court extended the time for Mr. More's response to summary judgment, most recently to September 14, 2001. Rather than filing anything in response, Mr. More has submitted yet another motion, this one asking the court to "commit to a position" regarding the standards that govern summary judgment and to permit him to submit his response to Defendant's motion for summary judgment privately to the court, without permitting Defendant to review it before preparing a reply. (Doc. No. 127.) On September 25, the date Mr. More himself set for presentation of this motion, he failed to appear.

It is now abundantly clear that Mr. More is either unwilling or unable to prepare a response to the Defendant's motion. Defendant is entitled to a ruling on that motion, and the court will proceed with that ruling, deeming the motion unopposed. The facts set forth below are set forth in Defendant's Local Rule 56.1 Statement. As noted, the overwhelming majority of these statements are supported by Plaintiff's own deposition testimony.

## FACTUAL BACKGROUND

A.  **Plaintiff's Employment History and Suspension**

More was hired by Hunt, an interstate motor freight services provider, as a

driver at Hunt's Bridgeview, Illinois terminal on May 5, 1998. (Defendant J.B. Hunt Transport, Inc.'s Statement of Uncontested Facts in Support of Its Motion for Summary Judgment, hereinafter "Hunt's Stmt. Facts" ¶ 2.) More, an at-will employee, was terminated on January 27, 1999 for failing to log his tours of duty in accordance with the Department of Transportation's Federal Motor Carrier Safety Regulations ("DOT Regulations") and Hunt's corporate policy. (Id. ¶¶ 3, 4, 6.)

As an interstate motor carrier, Hunt is bound by DOT Regulations which prescribe, *inter alia*, the length of time that a driver may drive without a break for rest: ten hours. (Id. ¶¶ 8, 9, 10.) DOT Regulations also provide that a long haul driver must keep a legible log reflecting the driver's hours of service that is current to the time last shown for the driver's last change of duty status, where duty status is defined as: "off duty, sleeper berth, driving, and on duty not driving." (Id. ¶ 11; quoting 49 C.F.R. 395.8(b) & (f)(1).)

Hunt maintains a Log Department to review its drivers' logs. Between August and November 1998, the Log Department sent More at least three notices regarding errors in his logs and violation of the driving time limitation. (Id. ¶ 27; Ex. K[1] to Hunt's Stmt. Facts.) At some unspecified time after November 1998, Mark Walters, More's Fleet Manager, warned More that he was "under scrutiny for both missing logs and too

---

[1] Exhibit K to Hunt's Statement of Uncontested Facts is several copies of notices sent by the Log Department to More about problems with his logs.

4

many November miles," and that his excessive mileage would raise a "red flag."[2] (*Id.* ¶ 31.)

Both before and after these warnings from the Log Department between August and November 1998, many of More's safety supervisors warned him about various problems with his logging practices. (*Id.* ¶¶ 32-36.) One significant problem was that at some point prior to December 1998, the computer that scans the drivers' logs had been unable to properly scan thirty of More's logs because of More's illegible writing. (*Id.* ¶¶ 36, 41-43.) In addition to warnings about legibility and errors, More was also warned at various times that he was behind on turning in his logs; for example, as of December 11, 1998, More's logs were three days behind. (*Id.* ¶¶ 41, 44-45.)

More complained that with his prior employers it had only been "a matter of going through the motions" to satisfy DOT inspectors, and that until working for Hunt, he had never had to expend so much effort complying with DOT Regulations, which, according to More, were "counterproductive . . . and very detrimental to the interests of society at large." (More's Dep. at 327-330.) More told his safety supervisor sometime late in 1998 to employ a more flexible, less "assiduous", application of the DOT Regulations. (*Id.* ¶¶ 51-52.) In particular, More thought that he should be able to log "moral estimates" of his driving hours in lieu of accurate times. (*Id.* ¶ 51.) More explained that a "moral estimate" is the time it *should* have taken to complete his drive,

---

[2] There is no evidence in the record as to whether or not the DOT or Hunt set mileage limits, or whether this reference to too many miles is based upon an extrapolation of the appropriate mileage from the driving time limitations.

5

discounting time spent waiting in traffic, construction delays, and any other condition that causes a trip to take longer than it otherwise would. (*Id.* ¶ 54.) This method, More contends, is necessary to counteract the time limits imposed by DOT Regulations, which inhibits the profitability of his position because he is paid on a per mile basis. (*Id.* ¶¶ 54, 57-58.)

More drove in excess of the time limits set in DOT Regulations, and rejected what he described in a letter he wrote to the company in December 1998, as "blind adherence, lockstep compliance" with DOT regulations.[3] (*Id.* ¶¶ 55, 61, Ex. N to Hunt's Stmt.) On the morning of December 17, 1998, in response to a message his supervisor sent to him on his onboard computer asking when his last eight hour break was, More replied: "If you would wake up and get the big picture and not cave in before the predators out here, then I could just drive the truck." (*Id.* ¶¶ 65-66.) That morning, More continued to refuse to answer his supervisor's question about when he had taken his last break. (*Id.* ¶¶ 67-70.)

At the end of December 1988, More was warned by his supervisor Steven Eichler that he was still having problems logging correctly. More met Eichler on January 18, 1999 to discuss this issue. (*Id.* ¶¶ 72, 74.) Eichler told More at the meeting that certain log entries were illegible and unacceptable, and gave More a written warning about his "negative attitude towards safety and compliance issues . . . 30 missing logs . . . [and]

---

[3] Hunt provided a copy of More's December 1998 letter as an exhibit to its statement of facts. The letter appears to be addressed to a Mr. Bush, although neither party explained what Mr. Bush's position was at Hunt.

his continuing problem with legibility . . ." (*Id.*¶¶ 79-82.)

On January 20, 1998, More was driving in Indiana when a transportation official stopped him at a weigh scale for being overweight on the truck drive axles. More confronted the Indiana State Police Scalemaster with his belief that it was inappropriate for her to issue a citation when there had been no substantial damage to any person or property. (*Id.*¶¶ 107, 109.) More then read to the Scalemaster four passages from the Catechism of the Catholic Church and quoted Congressman Steve Largent on taxation. (*Id.*¶ 110.) Apparently More refused to back down; the Scalemaster called Eichler to tell him that she and More had been arguing for more than an hour, and that she was unwilling to listen to More cite the Constitution and expound on Christianity and other issues not relevant to the issue of his ticket. (*Id.*¶¶ 113-15.) The Scalemaster impounded the truck for approximately two hours, while an agitated More asked her repeatedly, "Why don't you just shoot me now?" Later, the Scalemaster again called Eichler, regretful about having ultimately released More to drive again. (*Id.*¶¶ 117-18.)

Although More did not believe he had done anything to cause the load shift that resulted in the improper weight distribution, he did have a history of sudden decelerations and had been warned to avoid such excessive decelerations. (*Id.*¶¶ 120-21.) More met with his supervisors on January 23, 1999 regarding the weigh station incident. Supervisors told More they had concluded that he was responsible for the load shift, and that the quantity of his rapid decelerations indicated he was driving too

7

aggressively. (*Id.* ¶¶ 131-32.) More's supervisors also informed him that his conduct at the weigh station was not in Hunt's best interests. After this meeting, More returned to the weigh station and dropped off eight pages from the Catechism of the Catholic Church relating to authority, citizenship, equity and justice. (*Id.* ¶ 136.)

When More turned in his logs for the days following the incident at the weigh station, Eichler concluded that they were not current, they were illegible, the logs for January 24 and 25 were blank, and some of the required information was missing from the pages More did complete. (*Id.* ¶¶ 143-49.) Unable to challenge his failures to abide by specific rules and requirements of Hunt and the DOT, More nevertheless asserted at his deposition that he believed himself to have been within the "window of compliance" with respect to the logs he submitted. (*Id.* ¶¶ 150-51; More Dep. at 226, 286-88, 308.) Hunt disagreed with More's characterization of his logging practices, and finally terminated him on January 27, 1999 for repeated logging violations. (Hunt's Stmt. ¶¶ 152-53.)

B.   **More's Sexual Harassment Concerns**

In his EEOC charge, More alleged that he was harassed based on his sex. (Ex. F to Hunt's Stmt. Facts - More's April 30, 1999 EEOC charge.) There is some indication that More has abandoned this claim, which is not mentioned in his complaint filed with this court. The apparent bases for More's sexual harassment allegation are a few comments made to him by Jerry Johnston, More's Operations Manager, and by Charles Matlon, a personnel manager. (*Id.* ¶¶ 165-66, 181.) The first of Johnston's comments referred to fornication, the second to urination, and the third to an unnatural vice

8

mentioned in the *Beavis & Butthead* television show. (*Id.* ¶¶ 167, 170, 174.) Melton apparently made a comment in May or June of 1998 while in the bathroom about the "whopper" or "the big one," and then at some other time made a comment about a female co-worker that More believed suggested she was "available" or "hot." (*Id.* ¶¶ 181.) More did not explain the exact words that were used, nor why he found them to be so offensive and inappropriate, and the court has no basis for evaluating the severity of these comments.[4] More did not verbalize his displeasure in response to any of these comments, other than to sigh or groan, although on one occasion he apparently said, "Oh, no, not again." (*Id.* ¶¶ 169, 171-72, 175.)

Although More inquired of Hunt's Employee Relations Department about the procedures for filing a complaint of harassment, he ultimately failed to do so. (*Id.* ¶¶ 185-91.) On October 8, 1998, More met with Lonnie Copenhaver, More's terminal manager, and Johnston, to tell them that he believed Johnston had made comments that were incompatible with Hunt's sexual harassment policies. (*Id.* ¶¶ 193-96.) Copenhaver asked Johnston to assure both Copenhaver and More that it would not happen again, and More acknowledged that Johnston did not make any further comments of a sexually harassing nature. (*Id.* ¶¶ 198-99.) Despite the allegations on

---

[4] In order to determine whether the circumstances presented in a workplace created a hostile environment, the court would have to consider its frequency, severity, whether it was physically threatening or humiliating, and whether it created an abusive working environment. *Silk v. City of Chicago,* 194 F.3d 788, 804 (7th Cir. 1999). To be actionable, the behavior of which More complains must be both objectively and subjectively offensive, meaning that a reasonable person would find it hostile or offensive, and that the individual employee found it offensive. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

his EEOC charge, More explained in his deposition that he does not claim discrimination on account of his gender, but that he complained about "sexual harassment" because the comments of an allegedly sexual nature offended his religious beliefs, and that to charge sexual discrimination "was close enough . . . to accomplish the objective." (More Dep. at 115-21.)

C. **Religious Discrimination**

More is a "professed Catholic." (More Dep. at 352.) More believes that his supervisors have failed to act in accordance with "minimally acceptable objective and identifiable standards," and that his own religious beliefs are at the root of almost every dispute he has had with supervisors at Hunt because those supervisors, according to More, do not require themselves to operate according to such objective, identifiable standards. (*Id.* ¶¶ 214-21.)

More is convinced that Eichler in particular holds animus towards Roman Catholics. More cites a number of reasons for his belief about Eichler's animus, but the court finds none are persuasive. For example, More once used the onboard computer to refer to drivers in Kentucky as "pagans" and Eichler criticized him for making the comment, which, according to More, reflected Eichler's own religious animus against Roman Catholics. (*Id.* ¶ 228.) More also complained that a comment Eichler made about how much money Hunt was earning indicated that Eichler's moral priorities were out of order. (*Id.* ¶ 230.) Further evidence, according to More, that Eichler held anti-Catholic sentiment was that More believed Eichler was from rural Indiana, an assumption More made on the basis of the fact that Eichler drives a beat up pick-up

10

truck, and that Eichler talked about his dogs running along country roads. (*Id.* ¶¶ 231-32.) More offered no explanation as to why the mere fact that Eichler may have been from rural Indiana was indicative of animus against Catholics.

More believes that the disputes he had with Eichler over the legibility of his logs also had a religious underpinning. (*Id.* ¶ 233.) On one occasion, Eichler presented More with one of More's logs that Eichler said was not sufficiently legible. In response, More claimed that his religious beliefs prohibited him from being held to a subjective standard with respect to legibility. (*Id.*) More interpreted Eichler's subsequent refusal to prepare an "objective" formula for legibility and direction that More "shut up" about his religious beliefs as evidence that Eichler is biased against Catholics. (*Id.*)

More engaged in two communications via the onboard computer with Hunt supervisors other than Eichler, the substance of which also led him to the conclusion that these supervisors harbored ill-will towards Catholics. (*Id.* ¶¶ 240-44.) The substance of these conversations,[5] however, convinces the court that if there was any

---

[5] The following is an excerpt from one of the exchanges about which More complains:

> Plaintiff ("P"): Can I get paid 4 layover or does that have 2 be included in my 'rectification project' – Plz adviz
>
> Johnston ("J"): What is your understanding of what a layover is?
>
> P.: Your offer made when U needed something done – Plz notify me if pt of rfrnc changes later – that typ of untruthflness is a dragon I can + will slay.
>
> J: What the heck are you talking about?

(continued...)

11

ill-will harbored, it was by More against anyone who did not comprehend the relevance of his particular take on religion to the issue of his work performance.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Alexander v. Wisconsin Dept. of Health and Family Services*, No. 00-2603, ___ F.3d ___, 2001 WL 965938, *5 (7th Cir. Aug. 27, 2001). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Alexander*, 2001 WL 965938, at *5 (citing *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When making this determination, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Alexander*, 2001 WL 965938, at *5.

---

[5](...continued)
P: Scrape your memory, + U can tell me, unless U have amnesia + if U do, Ill just take my appeals + complaints 2 the next level, claiming I couldn't get what was evidently a fair settlement from U – Amend Nobody defrauds the Catholic Church on my conscience, intentionally or otherwise. It might be easier + less grief 2 take the disputes 2 Labor Board – would save me all research + prep time – plz adviz

J: Drive

## B. Plaintiff's Allegations of Discrimination

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion. . . ." 42 U.S.C. § 2000e-2(a)(1). Claims of discriminatory treatment because of religion under Title VII are analyzed in a similar manner as the typical race, sex and age discrimination cases. *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997). That is, an individual asserting discrimination on the basis of religion meets the burden of establishing a prima facie case if he demonstrates that he: (1) is a member of a protected class; (2) was qualified for the job in question; (3) was discharged; and (4) that the position remained open after his discharge to similarly qualified candidate. *Cf. Sattar v. Motorola, Inc.*, 138 F.3d 1164, ___ (7th Cir. 1998) (citing with approval a formula requiring plaintiff to offer "some additional evidence to support the inference that the [challenged] employment actions were taken because of a discriminatory motive.") If the employee meets that burden, the employer must offer evidence of a legitimate, non-discriminatory reason for the plaintiff's discharge; where the employer does so, a plaintiff may prevail by proving that the employer's articulated reason is in fact a pretext. *See Helland v. South Bend Community School Corp.*, 93 F.3d 217, 329 (7th Cir. 1996).

In this case, Defendant Hunt has submitted a motion for summary judgment support by abundant evidence of a legitimate, non-discriminatory reason for discharging Plaintiff More: his repeated violations of DOT and Hunt rules. Though given ample opportunity, More declined to respond to Hunt's motion for summary judgment.

Pursuant to Local Rule 56.1(a), the party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law" and a supporting memorandum of law. Loc. R. 56.1(a)(2), (3). Defendant provided a fully supported Local Rule 56.1(a)(3) statement of material facts in support of its motion for summary judgment, as well as an adequate supporting memorandum of law. The non-movant, in turn, must reply with a "concise response to the movant's statement" and its own supporting legal memorandum. Loc. R. 56.1(b)(2), (3). This statement must contain "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Loc. R. 56.1(b)(3)(A). Moreover, the non-movant must also submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment . . . ." Loc. R. 56.1(b)(3)(B). Most importantly, "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Id.* The court repeatedly explained these requirements to More, both orally and in writing.

More's failure to respond to Hunt's motion is dispositive here. Pursuant to Local Rule 56.1(b)(3)(B), Hunt's statement of the facts is admitted. In light of the fact that the vast majority of Hunt's fact statement stems directly from More's own deposition testimony, it is quite likely that More would have had no factual basis to counter Hunt's description of the relevant events, but would have sought to cast the same events in a different light. Nonetheless, it is without hesitation that the court states that the

14

record is devoid of evidence of discrimination, in any form, against More. Rather, More's continual, not only failure, but outright refusal, to abide by both Hunt's and the DOT's rules and regulations was, in this court's view, more than adequate to justify the termination of More's employment.

More has suggested to this court that this reason is a pretext. Indeed, he has importuned the court to assure him that if he were to demonstrate the pretextual nature of Hunt's reliance on rules violations as the reason for his discharge, the court would deny summary judgment. Over a period of several months, Mr. More has requested production of records of other drivers which will, he asserts, demonstrate that numerous other drivers engaged in repeated rules violations without any adverse action taken against them.

Defendant has now produced the records Mr. More has requested. If they contain evidence of rules violations by other drivers, the court would have expected Mr. More to offer that evidence in a response to this motion. As noted, he has submitted no response at all. Even if the records were to demonstrate rules violations by other drivers, the court notes the difficulty that Mr. More would face in arguing that such violations establish pretext. Mr. More's violations were serious and numerous. They occurred over a short period of time. His conduct included one outburst at an Indiana weigh station checkpoint. Mr. More received numerous warnings, but they had no corrective effect on his conduct. Most significantly, Mr. More showed by his conduct and words that he will not comply with rules that he believes are too rigid or otherwise improper. Unless there are other drivers who expressed similar attitudes, but were

15

allowed to maintain their employment with Hunt, the court would be unable to conclude that Hunt's stated reasons for discharging More were a pretext.

## CONCLUSION

Hunt's motion for summary judgment (Doc. No. 84-1) is granted. Its motion to modify the court's previous scheduling orders (Doc. No. 103-1) is denied without prejudice as moot.

ENTER:

Dated: September 27, 2001

REBECCA R. PALLMEYER
United States District Judge